No. 13-16974

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

*UNITED STATES*,

Appellant,

v.

*ESTATE OF E. WAYNE HAGE and WAYNE N. HAGE*,

Appellees.
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEVADA
_____

**BRIEF OF *AMICUS CURIAE* NATURAL RESOURCES DEFENSE
COUNCIL, INC. AND SIERRA CLUB IN SUPPORT OF APPELLANT THE
UNITED STATES AND SEEKING REVERSAL OF THE DISTRICT
COURT'S DECISION**
_____

John D. Echeverria
Vermont Law School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
Jecheverria@vermontlaw.edu
802-831-1386

Hillary M. Hoffmann
Vermont Law School
164 Chelsea Street, PO Box 96
South Royalton, VT 05068
hhoffmann@vermontlaw.edu
802-831-1205

Counsel for *amici curiae* Natural Resources Defense Council, Inc. and
Sierra Club

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

CORPORATE DISCLOSURE STATEMENT ................................................. vii

STATEMENT OF IDENTITY OF THE *AMICI* ............................................. vii

STATEMENT PURSUANT TO RULE 29(C)(5) ........................................... vii

CERTIFICATE OF COMPLIANCE .............................................................. viii

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

ARGUMENT ................................................................................................. 4

CONCLUSION ............................................................................................. 28

CERTIFICATE OF SERVICE ...................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972).......... 20, 21

*Britain v. Hansen*, 451 F.3d 982, 990 (9th Cir. 2006)...................................... 27

*Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073,
1081-82 (9th Cir. 2010) ............................................................................... 23, 24

*Cal. Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).............. 13

*Camfield v. United States*, 167 U.S. 518, 524 .............................................. 4, 13

*Causey v. United States*, 240 U.S. 399, 402 (1916)........................................... 14

*Colvin Cattle Co., Inc. United States*, 468 F.3d 803 (Fed Cir. 2007)................. 8

*Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998)................................. 26

*Diamond Bar Cattle Co. v. United States,* 168 F.2d 1209
(10th Cir. 1999)..................................................................................................... 8

*Dolan v. City of Tigard,* 512 U. S. 374, 384 (1994) ........................................ 10

*Estate of Hage v. United States*, 687 F.3d 1281 (Fed. Cir. 2012) ..................... 1

*Federal Lands Legal Consortium v. United States*, 195 F.3d 1190,
1198 (10th Cir. 1999)......................................................................................... 22

*Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1267
(9th Cir. 2006),................................................................................................. 12, 16

*Hage v. United States*, 51 Fed. Cl. 570, 591 (2002) ........................................ 8-9

*Hunter v. United States*, 388 F.2d 148, 154 (9th Cir. 1967).............................. 8

*Jourdan v. Barrett,* 45 U.S. 169, 184-45 (1856)................................................ 14

*Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976)................................. 5, 13, 20

*Leo Sheep Co. v. United States*, 440 U.S. 668, 679-81 (1979)................... 14, 15

*Light v. United States*, 220 U.S. 523, 535 (1911) ....................................... 5, 6, 7

*McFarland v. Kempthorne*, 545 F.3d 1106 (9th Cir. 2008) ............................. 12

*Murphy v. Burch*, 205 P.3d 289, 293 (Cal. 2009)............................................ 13

*Pub. Lands Council v. Babbitt*, 529 U.S. 728, 736 (2000) ......... 7, 21, 22, 23, 26

*Red Canyon Sheep Co. v. Ickes*, 98 F.2d 308 (D.C.Cir. 1938)........................ 23

*S. Utah Wilderness Alliance v. BLM*, 425 F.3d. 745, 788
(10 Cir. 2005)..................................................................................................... 15

*Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1057
(9th Cir. 2012)..................................................................................................... 20

*Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008)................................. 26

*United States v. Bundy*, No. CV-s-09-531-JBR (D. Nev. Nov 3, 1998),
*aff'd* 178 F.3d 1301 (9th Cir., July 22, 1999) ................................................ 3, 4

*United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 30 (1940)......... 13

*United States v. Dunn*, 478 F.2d 443, 444 & n. 2 (9th Cir. 1973)................... 12

*United States v. Jenks*, 129 F.3d 1348, 1355 (10th Cir. 1997) ........................ 17

*United States v. Grant River Dam Authority*, 363 U.S. 229, 235 (1960) ......... 13

*United States v. Estate of Hage*, 2013 WL 2295696 * 38
(D. Nev., May 24, 2013) ......................................................... 4, 5, 12, 23, 24, 25

*United States v. Vasarajas*, 98 F.2d 443, 446 n. 4 (1990) .............................. 14

*United States v. Walker*, 162 P.3d 882 (N.M. 2007) ......................................... 8

*Wedges/Ledges of Cal., Inc. v. City of Phoenix,* 24 F.3d 56, 62
(9th Cir. 1994).................................................................................................... 20

## Statutes

16 U.S.C. § 531 .............................................................................................. 11, 25

16 U.S.C. § 551 .................................................................................................... 6

16 U.S.C. § 1604 ................................................................................................. 26

16 U.S.C. § 580l ........................................................................................... 6, 7, 23

28 U.S.C. § 2401(a) ............................................................................................. 18

28 U.S.C. § 2409a(n) ........................................................................................... 14

43 U.S.C. § 315b ........................................................................................ 7, 10, 23

43 U.S.C. § 1712 ................................................................................................. 26

43 U.S.C. § 1732(a) ....................................................................................... 11, 25

43 U.S.C. § 1752................................................................................................... 8

**Regulations**

36 C.F.R. § 222.3(a) ................................................................. 21

36 C.F.R. § 222.3(c)(1)(ii) ........................................................ 21

36 C.F.R. § 222.4 ..................................................................... 26

43 CFR § 4130.2(a) .................................................................. 22

43 CFR § 4130.2(e) ................................................................... 23

43 CFR § 4130.2(e)(1) ............................................................... 23

**Constitutional Provisions**

U.S. Const., Art. IV, § 3 ............................................................. 5

**Other Authorities**

Adam Nagourney, "A Defiant Rancher Savors the
Audience that Rallied to His Side," *The New York Times*
(April 23, 2014) ........................................................................ 3

E. Wayne Hage, Storm over Rangelands: Private Rights in Federal Lands
(3rd ed. 1994) ........................................................................... 19

James Rasband, *et al*., Natural Resources Law & Policy 99 (2d ed. 2009) ...... 4

Rights-of-Way Across Nat'l Forests, 43 Op. Att'y Gen. 243, 255 (1980) ... 12-13

42 Op. Att'y Gen. 127, 148 (1962) ............................................. 13

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 29(c)(1), *amicus* Sierra Club, Inc. is a California nonprofit public benefit corporation, does not have shareholders, and does not have parent or subsidiary corporations. *Amicus* Natural Resources Defense Counsel (NRDC) is a New York nonprofit corporation, does not have shareholders, and does not have parent or subsidiary corporations.

## STATEMENT OF IDENTITY OF *AMICI*

Pursuant to Federal Rule of Appellate Procedure 29(c)(4), *amici* Sierra Club, Inc. and NRDC are nonprofit corporations dedicated to preserving the health of the federal public lands of the United States for future generations, as described in the accompanying Motion of Natural Resources Defense Council and Sierra Club Seeking Leave to File Brief *Amicus Curiae* in Support of Appellate the United States. *Amici*'s authority to file this brief is derived from Federal Rule of Appellate Procedure 29.

## STATEMENT PURSUANT TO RULE 29(C)(5)

The undersigned counsel affirm that they authored this brief in whole, that no funds were contributed by *amici* or the undersigned council in connection with

the preparation of the brief; and that no other persons contributed money that was intended to fund preparing or submitting the brief.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6985 words, excluding the parts of the brief exempted by Fed. R. App. P. 29 and 32.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word Times New Roman font, 14 point.

Natural Resources Defense Council and Sierra Club submit this brief *amicus curiae* in support of the United States and urge the Court to reverse the judgment below.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This appeal is the latest phase in a seemingly endless battle arising from the radical, misguided notion that defendants (collectively "the Hages") have a property entitlement to run cattle on the federal public lands without obtaining grazing permits or otherwise complying with the rules governing use of the public lands. For nearly twenty years the Hages prosecuted a fruitless "takings" lawsuit based on the theory that federal-agency enforcement of the public land laws resulted in a taking of their private property rights. *See Estate of Hage v. United States*, 687 F.3d 1281 (Fed.Cir. 2012). Paradoxically, even as they sought "just compensation" from the taxpayers for the alleged taking of their private property interests, the Hages continued, without authorization and without paying applicable grazing fees, to graze their cattle (and other peoples' cattle) on the public lands. The United States initiated this action in the District of Nevada to enforce the straightforward principle that parties exploiting the public lands without legal authority are trespassing on the public's property.

1

The district court concluded that the United States established only a few, nominal instances of trespass, largely because it adopted the novel theory that public land ranchers have a private property entitlement to graze cattle on public lands within one-half mile of appropriative water sources. Applying this theory, the court ruled that the government could prevail on its trespass claims only by proving that cattle were grazing *outside* the area defined by a one-half mile radius around water sources. Accordingly, the court disregarded voluminous evidence of trespasses where it was unclear whether the cattle had wandered beyond this new imaginary line. At the same time, the court ruled that the Hages could claim an easement by necessity granting them a property right (of uncertain physical dimensions) to run cattle on the public lands.

With respect to their counterclaim, the district court concluded that denials of the Hages' applications for new grazing permits and certain other government actions constituted a violation of due process.

There is no merit to any of the district court rulings. First, there is no legal basis for the holding, invented out of thin air, that the Hages can claim a private property right to use public lands surrounding water sources for grazing purposes. Apart from its lack of legal merit, this ruling, unless reversed, will wreak havoc on public lands management. Second, the district court erred in invoking the easement by necessity doctrine because (1) it does not apply to the federal

2

government, (2) there is no coherent theory for how the doctrine can apply on the facts of this case, and in any event (3) the elements for establishing an easement have not been satisfied because there was no necessity to imply an easement at the time it supposedly arose and there is no necessity today. Finally, the district court erred in finding a due process violation because (1) any due process claim was time-barred, (2) defendants could not properly assert a due process violation when they declined to pursue applications for grazing permits and, even if the defendants were denied permits within the limitations period, (3) the claim failed because the Hages have no "property" entitlement to a new grazing permit for due process purposes and permit denials would have been entirely consonant with due process principles on the facts of this case.

*Amici* do not address the district court's deeply troubling contempt ruling except to observe that, in our view, it is a sufficient answer that federal agency officials never engaged in any illegal actions in this case.[1]

---

[1] Another Nevada public land rancher, Cliven Bundy, has recently received extensive news coverage for his defiance of federal grazing regulations. *See generally* Adam Nagourney, "A Defiant Rancher Savors the Audience that Rallied to His Side," *The New York Times* (April 23, 2014). While relying from time to time on interlocutory orders issued in the *Hage* takings litigation to justify his refusal to pay grazing fees, Mr. Bundy's central argument in the trespass cases brought against him has been different: that by virtue of the Equal Footing Doctrine the United States government had no constitutional authority to retain ownership of the federal public lands in Nevada (or elsewhere in the West.) *See e.g. United States v. Bundy*, No. CV-s-09-531-JBR (D. Nev. Nov 3, 1998), *aff'd* 178 F.3d 1301 (9th Cir., July 22, 1999) (unpublished). The Supreme Court

ARGUMENT

## I.  THE HAGES' APPROPRIATIVE WATER RIGHTS DO NOT JUSTIFY THEIR TRESPASS ON PUBLIC LANDS.

The district court's most novel and potentially destructive ruling is that the Hages have a property right to maintain cattle on public lands in the vicinity of water sources in which they hold appropriative rights.  The district court purported to accept the principle that "there is no right to graze on federal land without permission."  *United States v. Estate of Hage*, 2013 WL 2295696 * 38 (D. Nev., May 24, 2013).  Yet, the court immediately contradicted itself by inventing the idea that a rancher's appropriative water rights include an entitlement to maintain cattle on public lands within one-half mile of the water sources.  *Id.*  at *45.  The court justified its creation of this new entitlement by observing that cattle grazing "cannot reasonably be prevented in the course of the use of a valid water right" and, therefore, preventing cattle grazing within the one-half mile area would

---

rejected this theory over a century ago.  *See Camfield v. United States*, 167 U.S. 518, 524 (1897) (within the borders of a state admitted to the union, "the [federal] government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers"); James Rasband, *et al.*, Natural Resources Law & Policy 99 (2d ed. 2009) (describing the Bundy theory as "long gone").  In practical terms, Bundy's and the Hages' different legal theories lead to the same incorrect, unjust conclusion -- ranchers have an entitlement to exploit the federal public lands for their own benefit at the expense of the ultimate owners of these lands, the citizens of the United States.

effectively "destroy" the water right. *Id.* The court recognized that the definition of the geographic scope of this new entitlement was "arbitrary," but determined that "a half mile of wandering" by cattle represented a "reasonable use" of a water right on public lands. *Id.*

There is no authority to support this extraordinary ruling and it is plainly mistaken. Under the Property Clause, the federal government is the owner of, and has broad regulatory authority over, the federal public lands. U.S. Const., Art. IV, § 3. The Supreme Court has "repeatedly observed that [the] power over the public lands thus entrusted to Congress is without limitation." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976). The district court's ruling contradicts the established understanding that the public owns the public lands. *Id.* In fact, the district court's ruling amounts to a judicial expropriation of public property rights for private benefit.

The Supreme Court has also long recognized that ranchers, in particular, can claim no property entitlement to use the federal public lands for grazing purposes. Starting in the mid-19th century, settlers in the West ran cattle on the public lands without permission. *Light v. United States*, 220 U.S. 523, 535 (1911) ("without passing any statute, or taking any affirmative action on the subject, the United States suffered its public domain to be used for [grazing] purposes"). This practice gave rise to what the Court called an "implied license" to use the public domain for

5

grazing purposes. *Id*. But, the Court emphasized, the "failure [of the United States] to object . . . did not confer any vested right on [a public land rancher], nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes." *Id.* Thus, ranchers' traditional use of the public lands to graze cattle did not create private property rights in the public lands.

Starting in the late nineteenth century, Congress enacted a series of laws governing grazing on the public lands that simultaneously revoked the prior "implied license" and reaffirmed public ownership of the public lands. *Id.* The 1897 National Forest Organic Act authorized the Secretary of the Interior, who initially had jurisdiction over both the national forests and the public domain lands, to "make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. Based on this authority, the Forest Service developed the first permitting program for grazing on public lands, which the Supreme Court upheld in *Light v. United States*. 220 U.S. at 535. Subsequently, Congress adopted the Granger-Thye Act, authorizing the Secretary of Agriculture, "upon such terms and conditions as he may deem proper, to issue permits for the grazing of livestock for periods not exceeding ten years and renewals thereof." 16 U.S.C. § 580l. The fact that these laws merely *authorize* the

6

Forest Service to issue grazing permits rests on the premise that the public is the owner of and has ultimate control over the national forests. *See id.* Moreover, the Granger-Thye Act expressly states "[t]hat *nothing herein* shall be construed as limiting or restricting any right, title, or interest of the United States in any land or resources." *Id.* (emphasis added).

The Taylor Grazing Act of 1934 established a parallel program regulating private grazing on the public domain lands administered by the Bureau of Land Management (BLM). 43 U.S.C. § 315b. The goal of the Act was to "stop injury" to the public domain due to overgrazing by substituting organization and regulation for unrestricted access. *Id*. § 315a. According to the Supreme Court, "The Act grant[ed] the Secretary of the Interior authority to divide the public range-lands into grazing districts, to specify the amount of grazing permitted in each district, to issue leases or permits 'to graze livestock' and to charge 'reasonable fees' for use of the land." *Public Lands Council v. Babbitt*, 529 U.S. at 733 (2000) (quoting 43 U.S.C. § 315b)) (*PLC*). The Taylor Grazing Act, like the Granger-Thye Act, explicitly states that "the creation of a grazing district or the issuance of a permit . . . shall not create any right, title, interest, or estate in or to the lands." *Id.*

Finally, the Federal Lands Policy and Management Act of 1976 directs both the Forest Service and the BLM to manage grazing and other uses of the public

lands in accord with the "multiple use" and "sustained yield" mandates to ensure that the public lands are managed for broad public benefit. 43 U.S.C. § 1752. Notwithstanding the fact that the public unquestionably owns the public lands, the district court thought that it was appropriate to recognize the existence of private rights in the public lands around water sources to ensure that public land ranchers can exploit their appropriative water rights. The Court should categorically reject this ruling.

Not surprisingly, other ranchers have previously attempted to use their appropriative water rights on public lands as a bootstrap to claim an entitlement to use the public lands for grazing purposes. *See, e g., Hunter v. United States*, 388 F.2d 148, 154 (9th Cir. 1967); *Diamond Bar Cattle Co. v. United States,* 168 F.2d 1209 (10th Cir. 1999). The claims have been *uniformly* rejected by the Ninth Circuit, *see Hunter*, 388 F.2d at 154, as well as by other federal and state courts. *Colvin Cattle Co., Inc. United States*, 468 F.3d 803 (Fed Cir. 2007); *United States v. Walker*, 162 P.3d 882 (N.M. 2007). Some ranchers have claimed a property right to graze "appurtenant" to their water rights based on traditional property law doctrine, *see, e.g.*, *Hunter*; others claimed a right based on the Mining Act of 1866 and other federal water statutes, *see, e.g., Colvin Cattle;* and still others argued that such a right was inherent in their state appropriative right. *See, e.g., Walker.* The courts have rejected all of these arguments. *See also Hage v. United States*, 51

8

Fed. Cl. 570, 591 (2002). In short, the district court ruling has no support in precedent and contradicts the rulings of every other court that has addressed the issue.

Furthermore, as a matter of first principles, there is no sound basis for asserting that ownership of water rights should confer private property rights in the public lands. An appropriative water interest and the public lands self-evidently represent distinct property interests that can be held by separate owners. Property law is full of examples of physically overlapping, but legally distinct property interests, such as air rights and surface rights, or surface rights and subsurface rights. *Any* distinct property interest will be more valuable to its holder if it can be combined with other adjoining interests, but the law does not authorize one person to claim ownership of his neighbor's property because it would benefit the would-be transferee. It is undeniable that government ownership of the public lands limits what the Hages can do with their water rights on public lands, but that is simply the logical and unavoidable consequence of the federal government's unquestioned authority to "prohibit absolutely or fix the terms on which its property may be used." *Light,* 220 U.S. at 536.

In any event, the district court was mistaken in asserting, at least on the facts of this case, that it would "destroy" the Hages' property right in its stockwater rights to reject their claimed ownership of the public lands. The grazing laws

9

accord priorities in issuing grazing permits to holders of "base property," which may include water rights. *See, e.g.,* 43 U.S.C. § 315b. Thus, so long as a rancher with water rights is willing to engage in the permitting process and abide by the regulations, and the lands remain open to grazing (as in this case), the rancher will have a priority right to use the public lands, and his stockwater rights as defined by state law. In addition, federal land managers chose to recognize the Hages' claim to authority to exercise a priority right in their stockwater rights, and exclude others from making use of their asserted junior rights, *see* U.S. Brief at 15, thus preserving to the Hages "one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Dolan v. City of Tigard,* 512 U. S. 374, 384 (1994).

The district court's legal theory also should be rejected because it would generate confusion and conflict in the administration of the public lands. Under this ruling, grazing cattle at certain locations on the public lands would constitute a privilege subject to strict regulations, but grazing cattle in other locations (sometimes the same cattle, after walking a few feet) would be a matter of legal right, presumably subject to different regulatory standards. As a result, the administration of the federal grazing programs would become more complicated than under the current unified system, to the detriment of federal land managers, public land ranchers and the general public.

10

Finally, the district court ruling conflicts with the multiple use mandate governing management of the public domain as well as national forests. Under the Multiple Use and Sustained Yield Act, the Secretary of Agriculture is required to conduct:

> The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land *for some or all* of these resources or related services over areas large enough *to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions*. . . .

16 U.S.C. § 531 (emphases added). *See also* 43 U.S.C. § 1732(a) (also imposing the "multiple use" mandate on the Secretary of the Interior). By permanently dedicating areas of the public lands to grazing purposes, the district court ruling, unless overruled, will undermine Congress' goal of allowing uses of the public lands to evolve to meet the needs of future generations.

## II. THE HAGES HAVE NO EASEMENT BY NECESSITY TO BRING THEIR LIVESTOCK TO WATER SOURCES ON THE FEDERAL PUBLIC LANDS

The district court also ruled that the Hages had a defense to the trespass action based on an easement by necessity, without defining the location or scope of this supposed easement. For multiple reasons, the court was wrong to recognize the existence of an easement by necessity.

A. An Easement By Necessity Cannot Apply to the United States.

First, the district court erred in asserting, without analysis, that an easement by necessity can lie against the United States. The court stated that "[a] private party can have . . . an easement by necessity against the United States." *Hage*, at *43* (citing *McFarland v. Kempthorne*, 545 F.3d 1106 (9th Cir. 2008) and *United States v. Dunn*, 478 F.2d 443, 444 & n. 2 (9th Cir. 1973)). However, the statements in each of the cases upon which the district court relied were *dictum*; the Court rejected the claims of easements by necessity in each case. *See id.* Moreover, in the intervening decision in *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1267 (9th Cir. 2006), this Court declared "[w]e do not agree" that "it is well settled" that the easement by necessity doctrine applies to the federal government. Fairly read, the pertinent Ninth Circuit precedents reveal that this Court has *not* resolved whether an easement by necessity will lie against the United States.

Assuming the Court needs to resolve the issue in this case (it does not), the Court should conclude that an easement by necessity does not lie against the United States. Applying this doctrine to the United States would contradict the basic principles of federal land management that Congress has plenary power over the public lands and that it is the will of Congress, as expressed in statute, which governs the disposition of federal public lands. *See generally* Rights-of-Way

12

Across Nat'l Forests, 43 Op. Att'y Gen. 243, 255 (1980); 42 Op. Att'y Gen. 127, 148 (1962). In general "[t]he power over the public land . . . entrusted to Congress is without limitations." *Cal. Coastal Com'n v. Granite Rock Co*., 480 U.S. 572, 580 (1987). As a result, the scope of any private rights in public lands must be determined by reference to statutory language and congressional intent. *See Camfield v. United States*, 167 U.S. 518 (1897). In addition, statutory grants must be interpreted in favor of the sovereign "lest they be enlarged to include more than what was expressly included." *United States v. Grant River Dam Authority*, 363 U.S. 229, 235 (1960). Because the power to define private rights in public lands is vested in Congress, and congressional grants must be narrowly construed, the courts have no authority to create such rights by implication. *Id.*

In addition, the doctrine of easement by necessity cannot logically apply to the United States because the doctrine is designed to settle disputes between private parties, not between a private party and the United States. 43 Op. Att'y Gen. at 243, 255 (1980). The common law easement by necessity doctrine seeks to carry out landowners' presumed intent. *E.g. Murphy v. Burch*, 205 P.3d 289, 293 (Cal. 2009). But the federal government is not an ordinary property owner. It holds the federal public lands as a sovereign, and as a proprietor. *Kleppe*, 426 U.S. at 539. Indeed, the federal government holds the public lands in trust for the entire citizenry. *United States v. City & Cnty. of San Francisco*, 310 U.S. 16, 30 (1940).

13

Therefore dispositions of public lands implicate broader public-interest concerns than dispositions of ordinary private lands.  *See Causey v. United States*, 240 U.S. 399, 402 (1916) ("the Government in disposing of its public lands does not assume the attitude of a mere seller of real estate at its market value").  The special character of the federal government's ownership of the public lands precludes judicial recognition of easements by necessity against the United States based on implication.

In accord with this reasoning, other common law property doctrines applicable to private parties do not apply to the United States.  For example, "adverse possession cannot be asserted against the federal government."  *United States v. Vasarajas*, 98 F.2d 443, 446 n. 4 (1990); *see* Quiet Title Act, 28 U.S.C. § 2409a(n) ("Nothing in this section shall be construed to permit suits against the United States based upon adverse possession.").  Likewise, no prescriptive right to an easement can be obtained against the United States.  *Jourdan v. Barrett,* 45 U.S. 169, 184-45 (1856).  Collectively, these rulings support the general principle, fully applicable in this case, that ordinary property law doctrines which may dispossess a land owner of ownership do not apply to the United States.

Significantly, the Supreme Court has said that applying the doctrine of easement by necessity to federal lands would be "somewhat strained, and ultimately of little significance" given that the "pertinent inquiry" in defining

14

private rights to use the public lands is what was the actual "intent of Congress." *Leo Sheep Co. v. United States*, 440 U.S. 668, 679-81 (1979). *Leo Sheep* may not technically resolve the specific issue presented by this case, because it involved a claim by the government, not a private grantee, to an easement by necessity. But its reasoning and result support the conclusion that the easement by necessity doctrine does not apply in the context of federal land management.

Finally, as a practical matter, judicial recognition of easements by necessity overlapping with statutory easements on the public lands would create great administrative difficulties for the agencies charged with managing the public lands. Easements by necessity could potentially cross extensive areas of the federal lands subject to rights of way created by statute, yet presumably have a different scope and be subject to different regulatory standards. In addition, claims of easements by necessity would give rise to frequent, time consuming litigation involving obscure historical evidence, imposing a judicial burden analogous to that already imposed on the federal courts by so-called "R.S. 2477" litigation. *See, e.g., S. Utah Wilderness Alliance v. BLM*, 425 F.3d. 745, 788 (10th Cir. 2005). Congress has imposed the R.S. 2477 burden on the federal courts, but the courts need not impose an analogous burden on themselves based on a misguided implied easements theory.

15

B.  Even if the Doctrine Applies, the Hages Failed to Establish an Easement.

Even if the easement by necessity doctrine could apply to the federal government, the district court erred in concluding that the Hages established an easement by necessity in this case.

In general, an easement by necessity arises when "(1) the title to two parcels of land was held by a single owner; (2) the unity of title was severed by a conveyance of one of the parcels; and (3) at the time of severance, the easement was necessary for the owner of the severed parcel to use his property." *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1266 (9th Cir. 2006).  Critically, to establish an easement by necessity, the necessity must have existed at the time of creation of the easement, and it must continue to exist at the time of the assertion of the easement. *Id.* at 1266.

First, the district court erred because the easement by necessity doctrine does not apply on the facts of this case.  Under the easement by necessity doctrine, an owner invokes the doctrine to gain access to an otherwise landlocked parcel.  Here, the event that, according to the district court, created the easement by necessity was the severance of the patent lands now held by the Hages from the public lands.  But the Hages require no easement to obtain access to their patent lands and do not seek one.  Instead, they are seeking to establish an easement to gain access across

16

federal lands to water sources located on federal lands. In short, this case simply does not fit within the easement by necessity framework.

In any event, the Hages cannot claim the benefit of the doctrine because there was — and is — no actual necessity for an easement to gain access to their water sources. At the time the Hages' predecessors ostensibly secured water rights on the public lands, they had a license to bring cattle onto the public lands to drink at water sources on those lands. Because they had legal permission to cross the public land to reach the water sources, there was no need to imply the existence of an easement affording them access to the water sources. *See United States v. Jenks*, 129 F.3d 1348, 1355 (10th Cir. 1997).

Finally, the Hages can claim no need for an easement by necessity to reach the water sources today. They could apply for federal grazing permits, but they have declined since the mid-1990s to pursue an application for a permit or otherwise comply with the grazing rules. This type of self-imposed disability obviously cannot provide the basis for a valid claim of an easement by necessity.

## III. THE DISTRICT COURT'S DUE PROCESS RULING IS MISTAKEN AND SHOULD BE OVERRULED.

The district court's ruling upholding the defendant's Due Process claim is also mistaken and should be overturned. Multiple reasons support this conclusion.

A.   The Counterclaim was Time-Barred.

First, any claim of a Due Process violation, as of the filing of the counterclaim in 2011, is barred by the statute of limitations.  *See* 28 U.S.C. § 2401(a).  Some of the Hages' allegations relate to the suspension and partial cancellation of grazing permits by the Forest Service in 1990, more than 20 years prior to the filing of the counterclaim.  So far as we can determine, every alleged action of the BLM or the Forest Service canceling, suspending or (arguably) denying grazing privileges was consummated by the mid-1990's, approximately 15 years prior to the filing of the counterclaim.  Defendants presented a potpourri of other, essentially frivolous allegations unrelated to grazing permits that supposedly support the due process claim.  *See* U.S. Brief at 53-54.  Even assuming for the sake of argument that these provide colorable support for the Due Process claim, they too fall outside the limitations period.

Starting in 1991, the Hages sought to vindicate their asserted legal rights by prosecuting a takings claim in the U.S. Court of Federal Claims.  The basic principle that every legal controversy must finally come to an end precluded them from re-launching the same dispute twenty years later under the banner of the Due Process Clause.

B. The Hages Decided Not to Seek New Permits for the Allotments at Issue.

Second, even if the Hages could avoid the limitations period, the record shows that at least since the 1990s the Hages declined to pursue applications for grazing permits. They declined to file an application for new grazing permits after their prior permits lapsed and, with respect to one allotment, did not pursue an appeal from the decision that their violation of grazing regulations rendered them ineligible for a permit. The primary reason the Hages ceased participating in the permit process was their viewpoint that they possessed vested rights to run cattle on the public range and therefore were exempt from regulation.[2] A viable Due Process claim depends on the claimant having been "deprived" of something to which she was ostensibly entitled. Because the Hages declined to pursue applications for permits, based on the theory that federal government has no authority to regulate their use of the public lands for grazing purposes, the Hages cannot plausibly assert a "deprivation" under the Due Process Clause.

---

[2] This thesis is developed at great length in E. Wayne Hage's book, Storm Over Rangelands: Private Rights in Federal Lands (3rd ed. 1994). Upon careful reading, this book simply amounts to a long complaint that Congress chose not to give public land ranchers the same rights to acquire private property rights in the public lands that it granted (at one time) to homesteaders and (still) to mining companies.

C.    No Property Right to a Grazing Permit.

Even if the Hages' claims were not time-barred, and assuming they could present a viable claim that they were denied new permits, the finding of a Due Process violation was still mistaken because the Hages failed to establish a property interest sufficient to support a Due Process claim.  The "threshold requirement to a . . . due process claim" is identification of a "property interest protected by the Constitution."  *Wedges/Ledges of Cal., Inc. v. City of Phoenix,* 24 F.3d 56, 62 (9th Cir. 1994).  "Property" for Due Process purposes is generally defined by a combination of state property law and federal constitutional law.  As the Supreme Court has explained, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577 (1972).   At the same time, "[f]ederal constitutional law . . . determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1057 (9th Cir. 2012).  As the Supreme Court put it in *Roth*:

> To have a property interest in a benefit, a person clearly must have
> more than an abstract need or desire for it. He must have more than a
> unilateral expectation of it. He must, instead, have *a legitimate claim
> of entitlement* to it.

20

408 U.S. at 577 (emphasis added).

The U.S. Constitution, the relevant statutory provisions, and the applicable BLM and Forest Service regulations all demonstrate that a public land rancher can assert no legitimate claim of entitlement to receive a new grazing permit.  As discussed above, the Property Clause confers power on Congress to manage the public lands "without limitation."  *Kleppe*, 426 U.S. at 539.  Because this case involves the issue of whether a person is entitled to a permit to use public lands, it is distinguishable from cases in which a person claims an entitlement to a permit to, for example, develop her private real estate, operate her private automobile, or operate a private business.   In all of these hypothetical cases, the permits authorize the use of what is unquestionably *private*, rather than *public* property.   The fact that grazing permits authorize use of public lands supports and arguably even dictates the conclusion that ranchers can assert no protected property right to receive permits to use the public lands.

The relevant statutes demonstrate that an applicant for a grazing permit can claim no entitlement to receive a permit.  As discussed above, the National Forest Organic Act, the Granger-Thye Act, and Taylor Grazing Act *authorize* the federal land managers to issue grazing permits.  But they do not dictate that permits be issued such that an applicant can claim an entitlement to have a permit granted.  As the Supreme Court explained in *PLC*: "Congress has made the Secretary [of the

21

Interior] the landlord of the public range and basically made the grant of grazing privileges discretionary." 529 U.S. at 735.

The agency regulations governing the public land grazing programs are consistent with this conclusion. The Forest Service regulations reiterate that the Service is merely "*authorized* to issue permits for livestock grazing" in the national forests, 36 C.F.R. § 222.3(a) (emphasis added); that is, the decision whether or not to issue a permit is left to the Service's discretion. To be sure, the regulations provide that "[a] term permit holder has first priority for receipt of a new permit at the end of the term period." *Id.* § 222.3(c)(1)(ii). But this priority is subject to the condition that the permit holder must have "fully complied with the terms and conditions of the expiring permit." *Id.* More importantly, this priority places no limits on the agency's discretion to decide not to issue a permit at all. *See Federal Lands Legal Consortium v. United States*, 195 F.3d 1190, 1198 (10th Cir. 1999) ("Although [a public land rancher] may have a priority during renewal, . . . the decision whether to issue or deny a permit is a discretionary one.").

Likewise, the BLM regulations confirm that there is no entitlement to receive a permit. *See* 43 CFR § 4130.2(a) ("Grazing permits and leases authorize use on the public lands and other BLM–administered lands *that are designated in land use plans as available for livestock grazing*.") (emphasis added). The regulations provide that incumbent ranchers should generally be given "first

22

priority" in receiving new permits, 43 CFR § 4130.2(e), but, again, they do not

impose any requirement that a permit be issued. *See id.* 43 CFR § 4130.2(e)(1)

("[p]ermittees or lessees holding expiring grazing permits or leases shall be given

first priority for new permits or leases *if* . . . [t]he lands for which the permit or

lease is issued remain available for domestic livestock grazing").[3]

Despite the clear language of the pertinent statutes and regulations, the

district court ruled, in effect, that public land ranchers have an entitlement to new

permits *ad infinitum,* granting them an irrevocable property interest in the public

lands. This ruling is contrary to the Supreme Court's insistence that the federal

government owns the federal public lands and has only granted "licenses" for the

use of these lands for grazing purposes. *PLC*, 529 U.S. at 735. It is also

inconsistent with the language in the statutes governing the Forest Service and the

BLM indicating that a grazing permit creates no property entitlement to the use of

the federal lands. And it is also inconsistent with Congress' determination to

authorize grazing permits for maximum terms of ten years. See Taylor Grazing

Act, 43 U.S.C. § 315b; Granger-Thye Act, 16 U.S.C. § 580l.

---

[3] The 75-year old D.C. Circuit decision in *Red Canyon Sheep Co. v. Ickes*, 98
F.2d 308 (D.C.Cir. 1938), upon which the district court relies, *see Hage*, at * 17,
39, does not support an entitlement to issuance of a grazing permit because the
court merely held that, *if* the BLM decides to allow grazing on public land, a
public land rancher with a preference to the right to the use of the lands in
question is entitled to injunctive relief to enforce the priority.

The district court stated that this Court has "confirmed that there is a property interest in a grazing permit for due process purposes," *see id.* at *32, n.38, * 41, citing *Buckingham v. Sec'y of U.S. Dep't of Agric.*, 603 F.3d 1073, 1081-82 (9th Cir. 2010), but this statement is based on a misreading of *Buckingham*. In *Buckingham* there was a dispute about whether an existing permit constituted "property" for Due Process purposes. *Id.* at 1081. This Court stated, "[b]ecause we hold that the Forest Service complied with the requirements of due process, *whether or not* Buckingham possessed a protected property interest in his grazing permit, we do not reach the question of the exact nature of that property interest here." *Id.* (emphasis added). In other words, this Court did *not* hold that plaintiff possessed a protected property interest for Due Process purposes. It was plainly a mistake for the district court to say that *Buckingham* "confirmed" that there is a property interest in a grazing permit for Due Process purposes. *Hage*, at *75, n. 38.

The district court's ruling on the Due Process issue ultimately rests on the mistaken notion that lands used for grazing purposes should be regarded as permanently dedicated to grazing use. The district court stated:

> The [Taylor Grazing Act] and the National Forest Organic Act of 1897 require that permits be granted or not based upon preferences *arising out of existing custom and usage*. . . . Although, for example, reasonable orders to remove cattle temporarily where a range has been over-grazed or where the range is in a drought condition would be within the realm of reason, *a due process violation could occur in this*

24

> *context if a permit were reduced or terminated for other reasons, such*
> *as to reserve use of the range for non-grazing purposes . . .*

*Id*. at * 41 (emphases added). The opinion then continues in the same vein: "The Government may *not* revoke exclusive grazing permits arbitrarily *or deny* initial or *renewal exclusive grazing permits* where an applicant has applied for a permit for *appropriate use and consistent with the historical grazing practices of himself and his predecessors-in-interest.*" *Id.* (emphases added).

Taken together, these passages announce a single sweeping proposition: that the BLM and the Forest Service have a legal duty to ensure that, once lands have been used for grazing purposes, they must *always* be dedicated to grazing purposes. This is decidedly not the law because, as discussed above, all the relevant statutes and regulations indicate that the land management agencies have discretion to decide *whether or not* to allow grazing to proceed. Furthermore, this position is inconsistent with Congress's mandate to the Forest Service and the Bureau of Land Management to promote "multiple use" on a "sustained yield basis." *See* 16 U.S.C. § 531; 43 U.S.C. § 1732(a).

Finally, this position conflicts with Congress' direction to the land management agencies to prepare comprehensive plans for the management of the public lands, including the identification of select areas that should be shifted from grazing to other, higher priority uses. The National Forest Management Act and the Federal Land Policy and Management Act direct the Forest Service and the

Department of the Interior to develop comprehensive multi-year plans for the management of the national forests and the public domain respectively. 16 U.S.C. § 1604; 43 U.S.C. § 1712. The land planning processes as administered by the agencies is a dynamic, forward-looking exercise designed to, among other things, eliminate certain uses where they were once permitted and to plan for new uses in areas where they were not previously allowed. In accord with plans developed through this process, the Secretary of the Interior is "authorized to reclassify and withdraw land from grazing altogether and devote it to a more valuable or suitable use." *PLC*, 529 U.S. at 736 (citing 43 C.F.R. § 4110.4-2(a)). *See* also 36 C.F.R. § 222.4 (granting the same authority to the Secretary of Agriculture). In light of the congressionally-mandated planning process, it is nonsensical to suppose that ranchers can claim fixed entitlements to maintain grazing in perpetuity on the public lands.

D. No Unconstitutional Deprivation.

Finally, even if the Hages' claim were not time-barred, even if they actually had been denied a permit, and even if they could claim a property entitlement to new permits (*none* of which is true), the district court's ruling on the Due Process claim *still* was mistaken because defendants failed to meet the "exceedingly high burden" required to show an unconstitutional deprivation under the Due Process Clause. *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008). As the district

court recognized, "only the most egregious official conduct can be said to be arbitrary" enough to violate Due Process. 2013 WL 2295696 * 41 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998)). More specifically, the issue in a Due Process challenge to alleged executive branch misconduct is whether it rises to a level "which shocks the conscience." 523 U.S. at 846. This test requires a great deal more than a showing that an agency official violated a statute or acted in an arbitrary and capricious fashion. *Cf. Britain v. Hansen*, 451 F.3d 982, 990 (9th Cir. 2006) ("federal courts have always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in these uncharted areas are scarce and open-ended").

Defendants did not come close to meeting this high standard. The evidence at trial demonstrated that the Hages repeatedly violated the terms of their permits. They ultimately declined, based on ideological opposition to federal regulation of the public lands, to pursue application for new permits. The district court zeroed in on the allegation that the government rejected the defendants' application for a new permit based on the defendants' addition of language to the application which, according to the district court, represented a "nonsensical" position on the part of the government. Even if this understanding of the facts were accurate, this type of alleged government error in judgment does not rise to the level of a constitutional violation. The district court also said that the federal agencies disregarded the

27

Hages' priorities to receive grazing permits, but this ruling was mistaken because defendants did not seek to enforce any priorities by following through on an application for a permit. Furthermore, a dispute about whether a rancher was denied a priority, at least absent extraordinary circumstances not present here, cannot rise to the level of a conscience-shocking Due Process violation.

## CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the district court.

Respectfully submitted,


____/s/ John Echeverria_____          ___/s/Hillary M. Hoffmann_____
John Echeverria                          Hillary M. Hoffmann
Vermont Law School                       Vermont Law School
164 Chelsea Street, PO Box 96            164 Chelsea Street, PO Box 96
South Royalton, VT 05068                 South Royalton, VT 05068
802-831-1386                             802-831-1205


May 15, 2014

## CERTIFICATE OF SERVICE AND DIGITAL SUBMISSION

I hereby certify that on this 15th day of May 2014, I electronically filed this Brief of *Amicus Curiae* Natural Resources Defense Council, Inc. and Sierra Club in Support of Appellant the United States and Seeking Reversal of the District Court's Decision with the Clerk of the Court through the Court's CM/ECF System. I further certify that the parties represented by counsel will be served through the CM/ECF System, and that copies were served on Wayne N. Hage by email.

___/s/ Hillary M. Hoffmann_____

Hillary M. Hoffmann